[Civ. No. 21200.   Second Dist., Div. Three.   Oct. 23, 1956.]

ALAN OSBOURNE, Appellant, v. FIRST NATIONAL TRUST AND SAVINGS BANK OF SANTA BARBARA (A National Banking Association), as Special Administrator, etc., Respondent.

W. P. Butcher, Pier Gherini and Frank R. Crandall for Appellant.

Price, Postel & Parma, J. F. Goux and Carleton B. Wood for Respondent.

WOOD (Parker), J.—Action by remainderman after termination of life estate to recover the portion of the subject matter of the life estate that was not consumed by the life tenant. Judgment was in favor of defendant, the special administrator of the estate of the life tenant.

Edward S. Field died in 1936, leaving a will in which he devised real property known as the Serena property to his wife, Isobel Field, for her life with power to do certain things with the property during her lifetime, and upon her death he directed that the remainder of that property be distributed to Lloyd Osbourne, his wife's brother. Under the decree of distribution in the Estate of Edward S. Field, the Serena property was distributed in accordance with the provisions of the will.

A few years thereafter Lloyd Osborne died, and his son Alan Osbourne, plaintiff herein, succeeded to Lloyd's rights with respect to the Serena property.

One of the contentions of plaintiff (appellant) is that the court erred in finding to the effect that there was no remainder to be distributed to him.

In August, 1947, Mrs. Field sold the Serena property, and

she moved therefrom to the El Mirasol Hotel in Santa Barbara. At that time she was over 90 years of age, confined to a wheel chair, and required the care of physicians and nurses.

While the escrow in the matter of the sale of the Serena property was pending, Mrs. Field employed Harold S. Chase as her agent to manage her properties, collect rents, pay bills, and in general to attend to her financial affairs. Her property included three business buildings in Santa Barbara, money and stocks and bonds. Her net worth at the time of appointing Mr. Chase as her agent was approximately $260,-000. On August 26, 1947, a few days after his appointment as agent, Mr. Chase opened an account at the First National Bank of Santa Barbara, which account was known as the Isobel Field *Properties Account*. That account was opened with a deposit of $18,856.67 which he received from Mrs. Field's account at the County National Bank of Santa Barbara. The selling price of the Serena property, including furniture, was $65,000. On September 5, 1947, Mr. Chase deposited the proceeds of the sale, $61,461 (after commission and other charges had been deducted), in the properties account. (The check received from escrow was for $61,724.45 but $263.45 was a rebate for taxes and insurance—leaving net deposit of $61,461 for Serena.) Thereafter, various deposits and disbursements, involving several thousands of dollars, were made in connection with that account. Until April 7, 1950, that was the only account used by Mr. Chase in matters pertaining to her property and in paying her bills for hotel, physicians, nurses, income taxes, and other similar bills. One of the disbursements made from that account was $50,000, in 1948, for the purchase of United States Savings Bonds. Another disbursement from that account was $10,000, in 1950, for the purchase of United States Treasury notes. A deposit made in that account, on March 4, 1950, was $73,174, the amount received from the sale of the Hutton Building in Santa Barbara.

On April 7, 1950, Mr. Chase opened another account at the First National Bank of Santa Barbara, which account was known as the Isobel Field *Investment Account*. On April 10, 1950, he transferred $73,174 (amount received for the Hutton Building) from the properties account to the investment account.

In December 1949, Alan Osbourne, plaintiff herein, commenced a declaratory relief action in the United States District Court for the Southern District of California wherein

he sought a declaration of his rights and the rights of Mrs. Field with respect to the Serena property. On April 25, 1952, that court rendered a judgment declaring that under the decree of distribution in Edward S. Field's estate Mrs. Field had a life estate in the Serena property with power to convey, and since the sale of that property she has had a life estate in the proceeds of the sale "with full and unrestricted power *to use and consume* so much of the proceeds as she desires during her lifetime, but she is prohibited from giving away or disposing of these proceeds by way of testamentary disposition; that unused or unconsumed proceeds of sale or property, whether real or personal, acquired from these proceeds remaining at her death become the property of the remainderman, Alan Osbourne, plaintiff herein; that plaintiff is now not entitled to any other or further relief." (Italics added.) That judgment became final.

Mr. Francis Price, Sr., counsel for Mrs. Field in the federal case, contended in that case that Mrs. Field was the owner of the fee title to the Serena property. About January 2, 1952, a memorandum of the decision in the federal case was received by Mr. Price. Mr. Price testified to the effect that although he believed that the proceeds of the sale of the Serena property had been consumed prior to that decision, he advised Mr. Chase, out of an abundance of precaution in the matter of showing that the proceeds were consumed, to open another account and put into it the amount of the net proceeds of the sale, as determined by Mr. Chase and the accountants employed by him, so that they could be sure that during the lifetime of Mrs. Field the proceeds would be used.

On January 12, 1952, Mr. Chase opened an account at the Security-First National Bank (of Los Angeles) at Santa Barbara, which account was known as the Isobel Field *Special Account*. The first deposit therein (on January 12) was $10,107.58, which was withdrawn from the investment account. This amount was the proceeds of a sale of the United States Treasury notes (purchased in 1950 with money from the properties account), which notes were sold on January 12, 1952—the date that the special account was opened. The only other deposit in the special account (made on March 8, 1952) was $42,970.83, which was withdrawn from the investment account. This amount was a part of the proceeds of a sale of the United States Savings Bonds (purchased in 1948 with $50,000 from the properties account), which bonds were sold

on March 8, 1952, for $47,400 and that amount had been deposited in the investment account. The total of the two deposits in the special account ($10,107.58 and $42,970.83) was $53,078.41, which amount was the amount of the net proceeds of the Serena property as determined by the accountants employed by Mr. Chase. (That amount was determined by deducting $8,382.59, the amount paid as income taxes on the Serena sale, from $61,461, the net amount deposited after close of escrow.)

When Mr. Chase became the agent of Mrs. Field he employed Scholefield and Company, public accountants, to keep the books of account and the records pertaining to Mrs. Field's financial matters. The books kept by those accountants cover the period beginning January 1, 1947, and show that the net worth of Mrs. Field as of that date was $257,010.61.

After January 12, 1952 (when the special account was opened), there were disbursements from the special account which reduced the account, as of September 10, 1952, to $4.06, which amount ($4.06) was then transferred to the investment account. Those disbursements included payments for hotel and personal expenses of Mrs. Field (not including gifts), her medical, accounting, and legal fees, agent's fees, income taxes, and miscellaneous expenses, totaling $27,141.49. Other disbursements from that account were: $564.40 for a television; $35.52 for a coffee table; $337 for a new roof on part of a theater building; and $25,000 in payment of a promissory note, made by Mrs. Field and payable to Metropolitan Trust Company, which note was secured by a trust deed on Mrs. Field's real property at 1018 State Street, Santa Barbara.

Mr. Price (counsel for Mrs. Field) testified to the effect that he advised Mr. Chase to open another account because he (Mr. Price) thought a question might arise as to whether payment of the $25,000 note from the *special* account was a proper use of the $25,000; and that in order to obviate such a question he advised Mr. Chase to open the account and use it for ordinary expenses of Mrs. Field.

On September 8, 1952, Mr. Chase opened another account in the Security-First National Bank, which account was known as the Isobel Field *Agent's Account*. He sold shares of stock and bonds in various companies for $28,708.93 and deposited that amount in the account. (It was his intention to deposit only $25,000 in the account, but the proceeds of the

sale of stocks and bonds exceeded that amount and the excess was inadvertently included in the deposit.) An additional amount of $128.92 was deposited therein, making a total deposit of $28,837.85. Disbursements from that account were for the living expenses and other expenses of Mrs. Field, except that $500 was transferred to a bank in New York. Mrs. Field died June 26, 1953. All the funds in the agent's account had been expended before her death.

It thus appears that there were three periods of time to be considered in determining whether the proceeds of the Serena property had been consumed. The first period (covering about four and a half years) was from the time the proceeds were received by Mrs. Field on September 5, 1947 (and deposited in the properties account), to the opening of the special account on January 12, 1952 (about two weeks after notice of the federal decision). The second period (covering about eight months) was from the opening of the special account on January 12, 1952, to the time when all the funds in the special account had been spent—September 10, 1952. The third period (covering about nine months) was from the opening of the agent's account on September 8, 1952, to the time when all the funds in the agent's account had been spent—before the death of Mrs. Field on June 26, 1953.

With reference to the first period of time (after the sale in 1947 to the opening of the special account in January, 1952), appellant asserts that the proceeds from the sale of Serena ($61,461) when deposited in the properties account on September 5, 1947, became commingled with other money of Mrs. Field and it would be impossible to determine whether the Serena proceeds were used to buy property or were consumed in paying taxes and for services rendered to Mrs. Field. The other money of Mrs. Field on deposit in the properties account at that time was $18,856.67 the opening deposit, $1,400 which was also deposited on September 5, and $263.45 the rebate which was included in the Serena check—making a total of $81,981.12, as commingled money. Appellant asserts further that in view of other deposits, exceeding $50,000, made in the properties account before $50,000 was withdrawn from that account (in 1948) to buy United States Savings Bonds, it would be impossible to determine that the $50,000 used for buying bonds was money from the Serena sale. It appears that the other deposits made in the properties account, prior to the opening of the investment account (de-

posits other than said $81,981.12 and the $73,174 received for the Hutton Building), were approximately $161,000. It appears that the deposits in the investment account, from the opening of the investment account (April 7, 1950) to the date of death of Mrs. Field (June 26, 1953), were approximately $204,000.

With reference to the second period of time (during the existence of the special account—from January 12 to September 8, 1952—which account was opened and depleted for the purpose of proving the expenditure of the Serena proceeds), appellant asserts in effect that, as a result of the commingling, the $53,078.41 deposit in the special account could not be determined to be Serena money. He argues further to the effect that, even if it be assumed that the $53,078.41 was Serena money, the said amount was not the correct amount of the net proceeds of the Serena sale, in that, the $8,382.59 paid as income taxes on the sale (and deducted from the $61,461 received, leaving $53,078.41) was not a proper computation of the taxes for the reason there was no capital gain on the sale but there was a capital loss; that the $8,382.59 was not due as income taxes but was in effect a gift to the United States and California—a gift that could not lawfully be made, even if it be assumed that the $8,382.59 was "unmingled" Serena money—and plaintiff should have had judgment at least for that amount. Appellant argues further to the effect that since the special account is apparently the basis for the judgment, and since the special account shows payments of $564.40 for a television, $35.52 for a coffee table, and $337 for a new roof on a part of the theater building, the plaintiff should have had judgment for those amounts. Appellant also argues that the $25,000 paid from the special account to satisfy the note, secured by trust deed on the 1018 State Street building, should have been found to be a part of the remainder of the Serena proceeds, or if $25,000 (in money) was not a part of such remainder then a portion of said real property (covered by the trust deed), in the amount that $25,000 bears to the whole value of said real property, should have been found to be a part of the remainder.

With reference to the third period of time (covering the existence of the agent's account—from September 8, 1952, to a time prior to Mrs. Field's death—which account was opened and depleted for the purpose of proving the expenditure of the $25,000 for ordinary expenses), appellant argues

to the effect that the evidence regarding the agent's account does not support the judgment; that by paying the $25,000 note from the *special* account and thereby releasing the trust deed, Mrs. Field acquired the unencumbered complete ownership in the 1018 State Street building and increased her interest in that real property; that, even if it be assumed that the *special* account from which the $25,000 note was paid represented Serena money, the additional interest acquired in the real property by payment of the $25,000 from the *special* account, remained after her death; and that the expenditure of the money which was in the *agent's* account ($28,708.93) did not amount to using and consuming the additional interest that was acquired in the real property.

The court found that from the date, August 22, 1947, that Mrs. Fields received the net proceeds of $61,461 from the sale of the Serena property and prior to her death on June 26, 1953, she used and consumed all of said proceeds from said sale; that at the date of her death there were no unused or unconsumed proceeds of said sale, and there was no real or personal property, acquired from such proceeds, remaining at the time of her death; that the entire amount of the proceeds from said Serena sale had been used and consumed by Mrs. Field during her lifetime in accordance with the federal decree; that at the time of her death Mrs. Field neither owned nor possessed any portion of the proceeds of the sale of the Serena property in cash or in real or personal property; that she did not give away any portion of such proceeds nor did she dispose of any portion thereof by testamentary disposition.

Appellant contends, as above indicated, that those findings were not supported by the evidence.

The net amount received from the Serena sale (after deducting commission and other charges) was $61,461. That amount was commingled with other money of Mrs. Field. When the money was received, and thereafter for approximately four and a half years, Mrs. Field and her attorney believed that the money belonged to her. During that time her medical and hotel expenses were high—averaging approximately $7,500 a year for medical expenses, and $11,000 a year for hotel expenses. Also, during that time her federal income taxes averaged approximately $9,000 a year. There were other expenses in substantial amounts. There was evidence that, at the time of the Serena sale, Mrs. Field needed additional cash for her living expenses and medical expenses.

After the federal decision, wherein it was decided that Mrs. Field had a life estate in the Serena proceeds with the right to consume the proceeds, Mrs. Field's attorney was of the opinion that the Serena proceeds had already been consumed; nevertheless, he deemed it advisable, in view of the problem of proving the use of the proceeds, to open a bank account and deposit therein the net proceeds of the Serena sale. Mrs. Field's agent opened the special account and deposited therein $53,078.41, the amount which Mrs. Field's accountants determined to be the net proceeds of the Serena sale after deducting the commission, other charges, and income taxes paid in connection with the sale. Although the attorney for Mrs. Field believed that the proceeds of the sale had been consumed prior to the opening of the special account, the special account was opened for the purpose of separating or "unmingling" the funds and establishing a record as to use of the separate funds. Appellant asserts that Mrs. Field was in the nature of a trustee toward the remainderman (appellant) and she had the legal duty, when she received the Serena money, to keep it separate from her other money so that she could account to the remainderman; and that when she commingled the money it lost its identity as the Serena money and it was impossible for her to account for the use of the money. It is not necessary to decide whether she was a trustee; but, even if she be regarded as a trustee, she could properly, after it was decided that she had a life estate only, set aside the net amount of the Serena sale and then proceed with the separate account as she could have proceeded if she had made a separate account when she first received the Serena money. In Scott on Trusts, volume 3, page 2481, section 517.3, it was said: "Even though the mingling of trust funds with his own funds is improper, the trustee can properly unscramble the funds in some cases." It was also said therein on the same page: "After such unscrambling, it seems clear, the beneficiaries can look only to the funds apportioned to them." In the present case, it was not improper to deposit the Serena money as it was originally deposited. The question involved with respect to depositing the money in that manner pertained to proving the use that was made of the money. Whether or not the Serena proceeds were consumed was a question of fact for the trial judge. Scholefield and Company, public accountants, kept the books of account and records for Mrs. Field from the time the Serena property was sold. Mr. Knapp, an

accountant for that company, testified regarding the real and personal property, income and expenses of Mrs. Field as shown by their books and records. Several written summarizations of the various accounts and records were prepared by those accountants and were received in evidence. ■ The summarization as to the special account shows that $53,078.41 was deposited in the account. It also shows expenses as follows: hotel and miscellaneous personal expenses, $10,606.09; medical expenses, $6,452.17; accounting, $600; legal, $1,250; agent's fees, $600; income taxes, $5,784.34; rental property expenses, $2,224.40; rental property repairs and maintenance, $381.98; miscellaneous expenses, $175.37; trust deed note to Metropolitan Trust Company, ·$25,000; transferred to investment account, $4.06. Those payments depleted the special account. Then the agent's account was opened for the purpose of establishing a record as to the use of $25,000, in the event that a question arose as to whether the payment of the $25,000 trust deed note from the special account was a proper payment. The summarization as to the agent's account shows that $28,837.85 was deposited in that account. Some of the expenses shown therein are as follows: personal expenses, $8,740.99; medical expenses, $8,213.66; rental property expenses, $6,228.48; property taxes, $1,394.55; architect's fees, $3,328. Other expenses shown therein (including $500 transferred to a New York bank) amounted to $931.67. Those payments depleted the agent's account.

Appellant asserts, as above shown, that $53,078.41, deposited in the special account, was not the correct amount of the net proceeds of the sale, in that $8,382.59 paid as income taxes on the sale (and deducted from the $61,461 received) was not a proper computation of the taxes. Mr. Knapp, the accountant, testified that in his opinion there was a capital gain on the sale and the income return was correct. The $8,382.59 was paid as income taxes on the sale. The evidence was sufficient to support a finding that said amount was properly expended as income taxes.

The amount deposited in the agent's account exceeded $25,000 by $3,837.85. Even if the amounts paid from the special account for a television, coffee table, and new roof (totaling $936.92), and the $500 transferred from the agent's account to a New York bank, should not be regarded as proper payments from those accounts, the total amounts thereof were more than covered by the excess deposit of $3,837.85.

The evidence was sufficient to support the above-stated findings of the court to the effect that the proceeds of the Serena property were consumed.

■ Appellant also contends that the court erred in granting defendant's motion to strike appellant's demand for a bill of particulars. Plaintiff alleged in his complaint that Mrs. Field received, as consideration for the Serena property, $65,000 less five per cent commission and the costs of sale; that after paying such commission and costs she had about $61,750 which she was entitled to consume; that the entire amount of the proceeds was unconsumed. Defendant alleged in its answer that the consideration for the property was $65,000, less five per cent commission amounting to $3,250 and costs of sale amounting to an additional sum of $8,671.59; and that Mrs. Field received $53,078.41 as proceeds of the sale. Defendant denied, in its answer, the allegation that she did not consume the proceeds, and it alleged that she did consume the proceeds. Appellant argues to the effect that he was entitled to a bill of particulars because defendant alleged an account in its answer. Section 454 of the Code of Civil Procedure provides in part: "It is not necessary for a party to set forth in a pleading the items of an account therein alleged, but he must deliver to the adverse party within ten days after a demand thereof in writing, a copy of the account, or be precluded from giving evidence thereof . . . ." The defendant's answer was in effect a denial of the allegation of the complaint with respect to the amount of the net proceeds of the sale; and the answer set forth an alleged defense to the complaint. Defendant did not allege an account. The court did not err in granting defendant's motion to strike the demand for a bill of particulars. In any event, pursuant to a written stipulation between the parties, appellant was permitted before the trial to examine the records and accounts of Scholefield and Company pertaining to Mrs. Field's financial transactions. Also, the stipulation provided that appellant had the right to make copies of the records or accounts. Appellant's accountant examined the records and accounts, and Scholefield and Company assisted him in making the examination.

Respondent asserts that the plaintiff (appellant) was not entitled to maintain the action against the bank, as administrator of Mrs. Field's estate, for the reason that if any portion of the Serena proceeds remained unconsumed that portion would not be a part of her estate; that if the bank

took possession of any unconsumed portion of the proceeds the bank would be liable in its individual capacity and not as administrator. In view of the above conclusion that the evidence supports the findings that the proceeds were consumed, it is not necessary to determine this contention of respondent.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 19, 1956.